HEARD NOVEMBER TERM, 1872.

## DONALDSON *vs.* BANK.

In an action against a bank which had failed, and stockholders thereof, to make the latter liable, according to the terms of the charter, for the amount of the shares held by them "at the time of such failure," a decree, which merely ascertains the date of the failure and orders references as to certain facts, is not appealable—the same not being a final judgment, within the sense of the Code of Procedure.

A decree or judgment is not final which leaves in doubt whether the plaintiff will, in the end, be entitled to recover.

BEFORE GRAHAM, J., AT CHARLESTON, JUNE TERM, 1872.

These were actions by R. J. Donaldson and others against the Farmers' and Exchange Bank and others; Hugh Walker against George A. Trenholm and others; James Bankhead against George A. Trenholm and others; and Tomlinson, Fort and others against the Farmers' and Exchange Bank and others.

The point decided on the appeal will be understood from the Circuit decree, which is as follows:

GRAHAM, J., (who, after stating the cases in the order above named, proceeded as follows): The first entitled case has, by an order of Court giving leave to amend, been made a creditors' bill, for the benefit of all creditors of the Farmers' and Exchange Bank. The next two entitled cases have been, by an order of this Court, consolidated with the first case, because involving the same question, namely: the liability of the stockholders of the Farmers' and Exchange Bank under its charter. The last entitled case was a suit brought in the Court of Equity for Charleston, by creditors of the bank, for the marshaling and distribution of its assets. By an order of Court the creditors of the bank were required to come in and prove their claims before Master Tupper.

At the expiration of the time fixed by the order, a dividend was declared and paid to those who had proved their claims; but a portion of the assets are still in the Court for distribution.

The orders, from time to time, made in these cases by the Court of Equity, to whose powers and jurisdiction this Court has succeeded, have all been directed to the end of bringing before the Court all the creditors of the Farmers' and Exchange Bank, that they may receive their due proportion of the assets of the bank, and of any fund which may be derived from the enforcement of the liabilities, which, it is alleged, are imposed by the charter of the bank upon the stockholders.

The defendants, who are alleged to have been stockholders of the bank at the time of its failure, or within twelve months previous thereto, deny their liability to the plaintiffs, upon various grounds. For the purposes of this decree, it will be necessary to state and consider some of these only.

The Farmers' and Exchange Bank of Charleston was incorporated by the Act of Assembly of December 16th, 1852, (12 Stat., 212.) This Act contains, among others, the following provisions:

"SECTION 1. That the charter of the Planters' and Mechanics Bank is hereby renewed for twenty-one years from and after the first of January next.

"SEC. 2. That said bank shall be permitted to enjoy all the privileges, rights, powers, immunities and benefits, which it now enjoys under the existing charter, and shall be subject to all the provisions of an Act passed on the 18th December, 1840, entitled 'An Act to provide against the suspension of specie payments by the banks of this State,' and also to such regulations and restrictions as the Legislature, from time to time, shall propose.

"SEC. 4. That in case of the failure of said bank each stockholder, copartnership or body politic, having a share or shares in such bank, at the time of such failure, or who shall have been interested therein at any time within twelve months previous to such failure, shall be liable and held bound individually, for any sum not exceeding the amount of his, her or their share or shares."

Section 8 incorporates eight new banks, and among them the Farmers' and Exchange Bank of Charleston, with this provision applicable to all and each of them: "which said banks shall have and possess the same rights and privileges, and be subject to the same duties, liabilities, obligations and restrictions herein provided for the said Planters' and Mechanics' Bank."

The full amount of stock having been subscribed, the bank was organized and proceeded to business. It issued and put into circulation, from time to time, bills to a large amount, which it redeemed on demand in specie, until 29th November, 1860, when, in common with the other banks in the city, it suspended specie payments and never afterwards resumed them. It continued, however, to issue its notes and to carry on its other banking business, until 1865, when, in consequence of losses sustained by the war and other causes, its

capital was so much impaired that it was compelled to close its doors and go into liquidation.

The defendants deny that the charter of the bank imposes the alleged or any other liability on the stockholders. They contend that, under the eighth Section, the Farmers' and Exchange Bank, and other banks thereby chartered, are expressly subjected, as banks or corporate bodies, to the same duties, liabilities, obligations, regulations and restrictions therein provided for the Planters' and Mechanics' Bank as a bank; but that neither this clause nor any other imposes any individual liability on the stockholders of the eight new banks. The absence of such a clause, they contend, is conclusive that no such liability exists. They submit that the Legislature may have intended to create such a liability, and may have thought that they had done so. Even if such were the case, the necessary clause amounts to *casus omissus*, which cannot be supplied by implication. This ground of objection was considered by my predecessor, in the case of *McRay* vs. *Whaley*, and, after elaborate argument, was overruled. I do not feel called upon to review this decision or reverse it.

Assuming, then, that the clause in the charter of the Planters' and Mechanics' Bank imposing a liability, in case of failure of the bank, upon the stockholders, forms a part of the charter of the Farmers' and Exchange Bank, the question to be considered is, whether the plaintiffs are entitled to the relief asked? The answer to this question must depend upon the further questions, what construction shall be given to the clause referred to, and who are the parties for whose protection it was intended?

In the determination of these questions very little, if any, aid can be derived from the decisions made in other States upon analogous statutes, and upon which so much reliance was placed by the plaintiffs' counsel. These decisions turned, in a great manner, upon the peculiar phraseology employed in the charters to which construction was given, and which differed, in several essential particulars, from that used in the statute now under consideration. In all these cases the charters not only imposed an individual liability upon the stockholders, but designated, with great minuteness, the extent of such liability, the contingency upon which it should attach, the particular class of creditors for whose benefit it was imposed, and the mode of procedure by which it should be enforced.

Upon all these points the charter of the Farmers' and Exchange

Bank is entirely silent. It is couched in the most general and ambiguous terms. It declares that the stockholders shall be liable in case of "failure," but does not indicate, in any way, the meaning of the word "failure," or say to whom, or for what, they shall be liable.

This want of technical skill in the framework of the statute necessarily renders its construction a task of no little difficulty and perplexity.

It is an established rule, in the exposition of statutes, that the intention of the law giver is to be deduced from a view of the whole and of every part of a statute taken and compared together.

When the general purpose of the statute is thus ascertained, the language of its provisions must be construed with reference to that purpose, and so as to subserve it. If the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the objects and remedy in view.—1 Kent, 462.

Applying the principles to the case in hand, it appears to me that the intention of the Legislature must be ascertained by construing the 4th Section of Act of 1852, in connection with the 2d Section of the same Act, which incorporates into the charter the provisions of the Act of 1840. That Act, dictated by considerations of public policy, was intended to provide against the suspension of specie payments by the Bank of the State.

It provides that, if any bank shall "declare a determination to suspend, or refuse payment of its notes, according to their legal obligation, in current coin," it shall be liable to pay to the State, at the expiration of every month after such suspension or declaration, and during the continuance thereof, a heavy penalty, to be recovered by the State, in an action of debt. In order to preserve the banks in a safe condition, and to prevent the currency from being debased, and the community defrauded, by an amount of bank bills in circulation disproportioned to the means of redeeming them, the Act required the President or Cashier of each bank to make monthly returns on oath, setting forth, among other things, the bills in circulation, the specie on hand, and the other resources of the bank.

From these provisions of the Act it is obvious that the leading object of the Legislature was to guard against the public mischief of an irredeemable circulation. By the Act of 1852, eleven banks

were about to be incorporated, each of them clothed with the right to issue bills or notes, intended to be the circulating currency, or medium of exchange, instead of gold and silver. Against bills thus put in circulation, a very disastrous experience had recently shown that the community had no practical means of protecting themselves.

This was the "mischief felt." This was the necessity and occasion of the law. It is not surprising, therefore, that the Legislature, throughout this Act, manifests an anxious solicitude to prevent an abuse of the high privileges it was about to confer upon the banks, and to secure, by the most stringent provisions, those who should receive the bills, in their daily business, as currency or money. To effect this end, it not only imposed upon the banks, as banks, a severe penalty in case of their suspending payment of their notes in specie, but also rendered personally liable, for the redemption of the notes, those who had asked for the privilege of supplying the circulating medium.

The second Section of the Act was designed, in case of a failure of the bank, to repair the *public* wrong due to the State, by an abuse of the charter which the State had granted.

The fourth Section was intended to repair the *private* injury sustained by those who had received, as money, bills of the supended bank.

These two Sections are in *pari materia;* they relate to one subject, are governed by one spirit and policy, and are consistent and harmonious parts and provisions in one system. They must, therefore, be construed together, and, so construed, lead irresistibly to the conclusion that the "failure" referred to in the fourth Section is a failure on the part of the bank to pay its notes, according to their legal obligation, in current coin." And this conclusion is confirmed by the language used. The liability of the stockholder is made to depend, not upon the insolvency of the bank, (its inability to pay its debts,) but, upon its "failure," or "suspension of payment."

This is the definition of the word "failure," given by Worcester and other lexicographers, and, in this sense, the context shows that the Legislature intended to use it. If this be not the true construction of the Act, it is difficult to say in what sense the Legislature could have used the word failure. If the bank did not fail when it refused or was unable to satisy its engagements in money as they became due, when did it fail? Was it when the whole mass

of its means, including property of every description, could not, by any possibility, or in any event, be made adequate to the liquidation of its existing debts ? This construction would make the failure of the bank equivalent to its total insolvency, and would render the liability imposed on the stockholder a security of little value to the creditor, who would have no means of determining the precise time at which this condition of its affairs was reached, and who, without this knowledge, would be unable to determine against what stockholders to bring suit. From the allegations in the complaint, the plaintiffs' view appears to be that the failure of the bank took place in 1865, when it closed its doors and ceased practically to exist; but there is nothing in the charter to warrant the conclusion that the Legislature intended to suspend the creditors' right to enforce the statutory liability of the stockholder until the insufficiency of the assets of the corporation was made to appear, either by the bank's voluntarily going into liquidation, or by judgment recovered, or execution issued against it.

The plaintiffs' construction is open, too, to the further objection that it would enable the bank, by keeping up the semblance of business, or the creditor, by delaying suit, to shift the liability arbitrarily from one set of stockholders to another. Such a provision would be unreasonable, and a construction which would lead to such a result should not be given to the Act, unless absolutely necessary to give it effect ; and, in my opinion, it is not required, and would be inconsistent with its whole scope and design.

My opinion is that the failure of the Farmers' and Exchange Bank, contemplated by the fourth Section of the Act of 1852, occurred on the 29th day of November, 1860, when it publicly suspended, and refused payment of its notes in current coin, and that the stockholders who became thereby liable were those at that time owning shares in the Bank, or who had held such shares at any time within twelve months previous to that date.

This brings us to the inquiry, to whom and for what are the stockholders liable ? In considering this question, we must bear in mind that, to create any individual liability for the debt of a corporation, is a wide departure from established rules, and depending solely upon provisions of positive law. Such liability is, therefore, to be construed strictly, and should not be extended beyond the limits to which it is plainly carried by the statute creating it.— *Gray* vs. *Coffin*, 9 Cushing, 199.

This rule is peculiarly applicable to a case like the present, where the vague and loose phraseology of the statute imposes an onerous liability, not only on those beneficially interested in the stock of the bank, but also upon executors, administrators, and other trustees, in whose name the legal title to the shares chanced to stand at the time of the failure of the bank, and upon married women, minors and other persons under disability, who could have had no participation or agency in bringing about the failure in consequence of which the liability is imposed.

The only creditors of the Farmers' and Exchange Bank who are before the Court as suitors in these several cases are those who hold the unpaid bills of the bank. This is the only class of creditors who responded to the call in the case of Fort *vs.* Farmers' and Exchange Bank, and it may reasonably be inferred that there are no others. There is no averment in the pleadings that the bills held by the plaintiffs were issued prior to the failure of the bank. The general allegation that the plaintiffs are bill holders is not sufficient, because the liability created by the charter was not intended, as we have seen, for the benefit of all the creditors of the bank, but only for the benefit of those who hold the bills of the bank, issued when they were convertible into coin, and constituted a part of the circulating medium of the State. But the holders of the bills of the bank issued after its failure, when they had ceased to be convertible into coin, and practically amounted to contracts for the payment of Confederate money, stand upon a very different footing. Whatever doubt there may be as to the proper construction of the charter in other respects, it is certain that both the *persons* liable as stockholders and the *extent* of their liability were fixed at the failure of the bank. There is nothing, either in the terms of this clause of the charter or in the reasons which led to its adoption, to give countenance to the idea that the Legislature intended to make the stockholders liable for debts of the bank contracted after its failure.

Those who dealt with the bank while in a state of suspension did so at their peril. They were not within the mischief against which the law intended to provide by fixing individual responsibility upon the corporators, and the Legislature has, therefore, left them to the protection of their own sagacity or vigilance. Against the bank itself they have a right of action, and they will be entitled to receive their proportion of its undistributed assets, unless,

indeed, the notes held by them should prove to be a part of those which it was stated at the bar had been unlawfully issued as a loan to the Confederate Government, in which case their right to recover, even against the bank, may be doubtful.

It was contended that the statutory liability imposed by the charter does not enure to the benefit of the bill holders who purchased the bills of the bank after its failure, and when they had ceased to have any of the characteristics of money, even though such bills may have been issued before the failure.

I do not consider this position tenable. Such an interpretation of the charter would defeat the object which we have attempted to show the Legislature designed to accomplish by it. The Act of 1852 made the stockholders liable for the redemption of the notes to twice the amount of stock held by them.

This liability, whether it be that of guarantors or original debtors, attaches to the notes issued prior to the failure, is part of them, as much as if written on the back of them, goes with the notes everywhere while they last, and invites every one to take them.—*Furman* vs. *Nicol*, 8 Wallace, 51. The holders of such bills are entitled, therefore, not only to enforce the statutory liability of the stockholders, but to claim the full amount of their face without any regard to the price at which they may have purchased them.

In deference to the wishes of the plaintiffs' counsel, I have consented to hear and determine the main issue of law involved in this case before the introduction of any testimony as to the character of the plaintiffs' claim. This inquiry is now necessary, as it would be improper to subject the defendants to further expense until it shall have been ascertained that those who are invoking the aid of the Court are holders of notes which the stockholders are bound to redeem.

I shall, therefore, direct an inquiry upon this point, and it may prevent delay and trouble hereafter to say, now, that, in my judgment, the date of a bank note is of little or no weight in determining the date of its issue. Its purpose of circulation involves this result. In ordinary banking business, such notes are usually paid into the banks and re-issued again and again. Whenever they are thus re-issued by the bank a new contract is made. It is upon this ground that the bar of the statute of limitations has been held to be inapplicable to such bills, though they are not distinguishable in form from ordinary promises to pay. For this reason,

I would hold, after so long a lapse of time since the suspension of the bank, during the greater part of which it continued its usual business, without any suit against it, by any bill holder, to compel payment in specie, that the presumption is that the bills now outstanding have been issued since the suspension, and that, therefore, the burden of proof is upon the holder, who claims a prior issue.

It is ordered that it be referred to Wm. J. Gayer, Esq., to take testimony as to whether the plaintiffs are holders of bills of the Farmers' and Exchange Bank, issued prior to 29th November, 1860, and that he report the testimony to the Court.

It is further ordered that the Referee take testimony and report what bills, if any, of the said bank, proved before him, were issued as a loan to the State of South Carolina, or to the Confederate States, in aid of the rebellion.

The plaintiffs in the case of Donaldson and others appealed on a number of grounds, which it is unnecessary to state.

*Chamberlain, Seabrook & Dunbar*, for appellants.

*Magrath & Lowndes*, contra.

Feb. 17, 1873. The opinion of the Court was delivered by

WILLARD, A. J. The decree appealed from is clearly not final in the sense entitling it to be brought in this Court. The decree merely determines an important question on which the rights of the parties may, to some extent, depend, but establishes no rights as between the parties plaintiff and defendant.

Several persons unite as plaintiff, alleging that they are holders of bills issued by the Farmers' and Exchange Bank. They seek to recover the amount of these bills from certain defendants, who, they allege, were stockholders of the bank at the time of its failure, and, as such, liable, personally, under the statute, on account of such obligations, to an extent equal to twice the amount of stock held by them.

This claim involves an important question, namely, at what period of time must the bank be regarded as having failed, in the sense of the statute. Two periods were alleged, one in 1860, when the bank ceased to make specie payments, and one in 1865, when it was ascertained to be insolvent. The decree fixes the period of failure in 1860. Before the rights of the parties can be fixed, as it regards

the bearing of this question of the date of failure upon them, it must be ascertained whether the bills held by the plaintiffs were issued and in circulation at such date of failure, and whether the defendants were stockholders at that time. There appear to be, in addition to these, other questions that may have to be brought to a solution before a final decree can pass, but for the present purpose it is enough to know that the rights of the parties have not been passed upon to such an extent as to show that they will ultimately be entitled to a decree. We cannot say, from the record before us, but that the complaint will finally be dismissed, as against all the plaintiffs, for the want of a substantial interest in the question passed upon by the decree.

A decree or judgment cannot be regarded as final that leaves in doubt the question whether the plaintiff will, in the end, be entitled to recover. Such a decree may pass upon an important question material to be considered in its bearing on the result of the case, but it is the office of a decree to go further than to settle the question on which the rights of the parties depend—it must ascertain and fix these rights to an extent amounting to a substantial termination of all questions directly at issue in the case.

The present decree stops short of reaching this point, and, by its terms, ordering a reference to ascertain certain facts, contemplates a further hearing in the Circuit Court before a final adjudication is reached.

The decree, not being final, is not appealable into this Court at the present stage of the proceedings, and the appeal must be dismissed.

*Moses*, C. J., and *Wright*, A. J., concurred.